UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ELAINE JAROS,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )    No. 4:08 CV 1014 CAS
                                 )                      DDN
                                 )
 MICHAEL J. ASTRUE,              )
Commissioner of Social Security, )
                                 )
            Defendant.           )

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Elaine Jaros for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

## I.  BACKGROUND

Plaintiff Elaine Jaros was born on June 30, 1954. (Tr. 22.) She is 5'4" tall with a weight that has ranged from 130 pounds to 197 pounds.[1] (Tr. 160, 179.) She was never married, and has four children and ten grandchildren. (Tr. 160.) She completed the 8th grade and reported receiving special job training, but could not remember what kind of training.[2] (Tr. 158.) She last worked as a cook at Country Mart during July 2005. (Tr. 132.)

On August 10, 2005, Jaros applied for disability insurance benefits, alleging she became disabled on January 1, 2000, on account

---

[1]A disability report listed her height as 5'7". (Tr. 153.)

[2]Karen MacDonald, Psy. D., noted that Jaros completed the 9th grade with the help of special education classes. (Tr. 160.)

of hypertension, tuberculosis, and depression. (Tr. 22, 41, 69, 128.) She received a notice of disapproved claims on December 16, 2005. (59-63.) The ALJ held a hearing on August 23, 2006. (Tr. 273-85.) On October 12, 2006, the ALJ requested a consultative psychological examination, with IQ testing and an opinion on the presence of malingering or fake bad behavior. (Tr. 41.) The ALJ held a supplemental hearing on May 30, 2007. (Tr. 286-342.) The ALJ denied benefits on September 6, 2007. (Tr. 7-20.) On June 2, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-4.)

## II. MEDICAL HISTORY

On November 25, 2002, an x-ray revealed a normal chest and a normal abdomen. (Tr. 264.)

On July 8, 2004, Jaros went to the doctor for a physical. According to the medical notes, the Department of Social Services wanted to know why Jaros could not work. Jaros also complained of a cough, stopped up ears, and a runny nose. She wanted to be checked for tuberculosis and wanted a chest x-ray.[3] She had not seen a doctor in two years. (Tr. 235.)

On August 5, 2004, a chest x-ray showed the lungs were well expanded, with no infiltrates or effusion.[4] There was no acute pulmonary disease and Jaros's heart was a normal size. (Tr. 249.)

On July 29, 2005, Susan Zimmer, Jaros's daughter, indicated her mother was really "out of control." She would perform activities and not remember doing them. She was unable to shop for herself, clean, think rationally, read her own mail, or pay her own bills. (Tr. 158.)

_____

[3]Tuberculosis is a disease caused by the presence of a bacteria which can affect almost any tissue or organ in the body, though the lungs are most commonly affected. Stedman's Medical Dictionary, 1649 (25th ed., Williams & Wilkins 1990).

[4]Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Stedman's Medical Dictionary, 491.

On August 12, 2005, J. Lagrone completed a disability report. Lagrone noted being unable to conduct an interview with Jaros. (Tr. 128-30.)

On October 14, 2005, Susan Zimmer completed a third-party function report and a function report. Zimmer spent every day with her mother, and lived in the trailer next door. In response to a question about Jaros's daily activities, Zimmer wrote "moody, in pain." She indicated Jaros had no difficulties with personal care, prepared all her own meals, and was able to clean, do laundry, and do yard work. Jaros cooked daily, and might make sandwiches, fish, or a burger. Jaros drove on occasion and played with the children. She went shopping on a monthly basis, mostly for food, and went with her children. She had been fired from one job because she didn't get along with another co-worker. (Tr. 88-95, 96-103.)

On October 14, 2005, a pain questionnaire indicated Jaros had daily pain in her chest, right arm, and lap.[5] The pain sometimes prevented her from getting out of bed. Jaros took Tylenol PM to relieve the pain. (Tr. 104.)

On October 14, 2005, Jaros completed a work history report. She noted working as a cook in a camp during 1996, as a laborer from 2000 to 2002, as a nurse's aid during 2002, and as a cook at Hardees during 2002. As a laborer, she worked with screwdrivers and tape guns, and moved items to skids. In response to the question "Describe this job. What did you do all day?" Jaros wrote "knife, cooking utenils [sic]" for the two cooking jobs. (Tr. 147-52.) On another work history report, Jaros noted working twenty hours a week as a cook at Country Mart during July 2005, but being fired for being unable to understand instructions. (Tr. 131-36.) Yet, a disability report indicates Jaros stopped working on July 1, 2005. (Tr. 154.)

On December 14, 2005, James W. Lane Ph.D. completed a psychiatric review. He checked the box indicating there was no medically determinable impairment and the box indicating there was insufficient evidence. The notes indicate that two consultative psychiatric

---

[5]Based on the handwriting, it appears Zimmer also completed this form on behalf of her mother.

examinations had been scheduled, but Jaros had not attended either appointment. (Tr. 106-18.)

On December 21, 2005, Karen A. MacDonald, Psy. D., completed a clinical psychological evaluation and a mental status examination for Phelps County Family Support Division. Jaros reported having tingling in her fingers, migraines, and tuberculosis since 2000. She denied having any hallucinations, suicidal thoughts, or problems with substance abuse. In a typical day, Jaros cleaned her house and did her own chores, though her daughter shopped for her. She did not like to be around other people, excluding family members, and "often 'wants to kill her neighbors.'" (Tr. 160-61.)

A mental status exam found Jaros was clean with adequate hygiene. She had adequate eye contact, was cooperative, and had no bizarre gestures. Her responses were congruent, her speech was clear, logical, and coherent, and she appeared to be in no acute emotional distress. She was oriented and denied any suicidal ideation. Abstract-conceptual thinking was adequate, but her memory functions were impaired. Mental control was impossible, as was she unable to count by 3s. Social judgment skills were also massively impaired, which reflected cultural impoverishment. "Intellectually, she appeared to be functioning in the mildly retarded range." Jaros was oriented and not psychotic, but showed an inability to resist aggressive impulses; she was extremely reactive. MacDonald assigned her a GAF score of 50.[6] (Tr. 161-62.)

On February 22, 2006, Jaros's lab work was abnormal. The handwritten note indicates Jaros needed to lower her blood sugar level. (Tr. 246.)

---

[6]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. On the GAF scale, a score of 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

On February 23, 2006, a chest x-ray showed the lungs were clear of focal infiltrates, and the cardiac silhouette and thorax were unremarkable. The doctor found no evidence of active intrathoracic disease. (Tr. 242.)

On March 23, 2006, Jaros went to the doctor, complaining of a head cold, earache in both ears, elbow pain, difficulty with range of motion, burning, tingling, and numbness. (Tr. 238-39.)

On September 9, 2006, Jaros went to the emergency room, complaining of sharp abdominal pain. A physical examination showed Jaros was in no acute distress or respiratory distress. Her heart rate and rhythm were regular, her back was normal, her extremities were non-tender, and she was oriented. Her behavior was appropriate. An x-ray of the abdomen showed no suspicious pathological calcifications or free air. A few phleboliths were noted in the urinary pelvis, and there was a small linear metallic density overlying the femoral head.[7] After a few hours in the hospital, she noted the pain was 1/10, and stated she was "ready to go home." She was discharged home that same day, told to resume her regular medication, and instructed on better nutrition. (Tr. 210-31.)

On September 25, 2006, Jaros spoke with Connie Collins, MA, LPC, about the Pathways community support program. Jaros stated her depression, anxiety, and anger were the reasons she needed help. In an assessment, Collins rated Jaros's depression, anger, and isolation as severe and chronic. Her manner was helpless or hopeless, and her mood was dysphoric.[8] Her orientation was within normal limits, her attention and judgment were fair, but her insight was poor. Her thought content was within normal limits, and she denied having suicidal or violent thoughts. Jaros reported a history of physical and sexual abuse in her last two relationships. She had not worked for seven years. She was her own guardian, but was losing her eyesight. At the time of the interview, Jaros was taking Hydrocodone, Captopril, Potassium, and

_____

[7]A phlebolith is a calcium deposit in a vein wall. Stedman's Medical Dictionary, 1186.

[8]Dysphoria is a feeling of unpleasantness or discomfort. Stedman's Medical Dictionary, 479.

Metformin.[9]  Jaros complained of depression and cried throughout the interview.  She rarely left her home, and had no desire to do anything or go anywhere, which she attributed to the stress of worrying about her children.  One son was in prison for armed robbery, and another was gay. Her daughter did her shopping and laundry.  Jaros did not like to be around people, though she was not anxious about being around others; she simply got irritable around other people and preferred to be home where she felt safe.  Jaros told Collins that the only reason she was at Pathways was because her attorney and her primary care physician had instructed her to go.  (Tr. 190-205.)

On October 4, 2006, Barbara Lowry, MA, PLPC, of Pathways, met with Jaros at her home.  Jaros was dressed appropriately and appeared to have good hygiene.  Jaros was taking her medications and appeared to be in a stable mood.  She was diabetic, had high blood pressure, and had tuberculosis, but it was inactive.  Jaros stated a chest x-ray from nine months ago had been clear.  She also had a bone spur in her foot, but could not have surgery until her blood pressure lowered.  Jaros complained of being in pain and having trouble sleeping.  She was living with her daughter in a trailer, and her daughter helped Jaros with her paperwork and did not charge her rent.  (Tr. 188-89.)

On October 11, 2006, Lowry met with Jaros at her home.  Jaros was taking her medication as recommended, but had not talked with the doctor about her blood pressure medication.  She was having problems with her neighbor, and was prepared to "hurt her" if she continued.  Jaros had a boarder staying with her, to help with the bills.  However, taking care of the boarder was exhausting, and she thought he might have Alzheimers.  (Tr. 184-86.)

On October 24, 2006, Lowry met with Jaros.  Jaros had been having problems with her neighbor, who had accused her of stealing from her. Jaros told Lowry she had "had it" and was ready to "hurt this lady and both of them can go to jail."  (Tr. 183.)

_____

[9]Hydrocodone is a narcotic pain reliever, used for short periods of time, to treat moderate to severe pain.  Captopril is used to treat high blood pressure.  Metformin is used to control high blood sugar. WebMD, http://www.webmd.com/drugs (last visited July 20, 2009).

On October 26, 2006, Jaros received a diagnostic evaluation, after presenting with depression, auditory hallucinations, and post-traumatic stress disorder. The evaluation indicates Jaros had no hospitalizations or suicide attempts. She had no seizures, but was positive for migraines, diabetes, and obesity. Jaros was raised by a biological parent and her three sisters. There was no history of sexual abuse, but she noted a fifteen year history of physical and emotional abuse by a boyfriend. Jaros lived alone, but lived next door to her daughter. One of her sons was in prison, and another son had recently been released from prison. She had last worked in 2000, and her longest period of employment had been 18 months in a factory. Her general appearance was sad and worried, with a depressed mood. She felt persecuted, had assaultive ideas and auditory hallucinations. Her motor activity was normal, but she showed poor insight and poor judgment. There was no imminent risk of either suicide or violence. The treating physician spoke with Jaros about depression and prescribed her a trial of Celexa and Trazodone.[10] The physician assigned Jaros a GAF score of 40.[11] The physician's signature is illegible. (Tr. 174-81.)

On October 27, 2006, Lowry accompanied Jaros to her psychiatric appointment. Jaros stated she was complying with her medication, but was still having trouble sleeping. Her son had recently been diagnosed with colon cancer. (Tr. 182.)

On November 18, 2006, John Keough, MA, a licensed psychologist, conducted a psychological consultation with a mental status examination. Jaros believed she was disabled because of her tuberculosis. She also complained of hypertension, carpal tunnel syndrome, and heel spurs. She complained of depression, suicidal thoughts, crying bouts, and having

---

[10]Celexa is an anti-depressant used to treat depression. Trazodone is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited July 22, 2009).

[11]On the GAF scale, a score of 40 means there is an impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). A score of 40 represents worse than serious symptoms. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

no energy or hope.  She denied having any significant anxiety.  She had trouble reading, writing, and understanding instructions.  She experienced anger and had trouble getting along with others.  She only slept about three hours a night.  At the time, she was taking Metformin, Trazodone, Phenylhistine Expectorant, Hydrochlorothiazide, Captopril, Hydrocodone, Potassium Chloride, Citalopram, Amoxicillin, and Metoprolol.[12]  She was not taking any psychiatric medications, but had previously taken Prozac.[13]  (Tr. 163.)

A mental status examination showed Jaros was in no physical discomfort, but anxious.  She was able to understand and follow simple instructions.  She was appropriately dressed, her eye contact was adequate, and had no unusual gestures or mannerisms.  Her speech was relevant and there was no evidence of bizarre thought associations.  She was oriented.  She denied being suicidal and denied ever making a suicidal gesture.  Jaros had anger management issues, and went into rages.  She was able to count by 3s.  Testing showed her general memory was low average, but her working memory was extremely low.  A test of her intellectual functioning showed Jaros was in the extremely low range, with a full scale IQ of 68.[14]  However, Keough thought her motivation was questionable, she was extremely nervous, and was not able to put forth her best effort.  He thought the test results were a low

---

[12]Phenylhistine Expectorant is used to temporarily treat cough, chest congestion, and stuffy nose symptoms caused by the common cold, flu, or other breathing illnesses.  Hydrochlorothiazide is used to treat high blood pressure.  Citalopram is an anti-depressant used to treat depression.  Amoxicillin is a penicillin-type antibiotic used to treat a wide variety of bacterial infections.  Metoprolol is used to treat chest pain, heart failure, and high blood pressure.  WebMD, http://www.webmd.com/drugs (last visited July 22, 2009).

[13]Prozac is used to treat depression, anxiety disorders, and obsessive-compulsive disorder.  WebMD, http://www.webmd.com/drugs (last visited July 22, 2009).

[14]An IQ score between 71 and 84 is classified as borderline intellectual functioning.  Hutsell v. Massanari, 259 F.3d 707, 708 n.3 (8th Cir. 2001) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 39-40, 684 (4th ed., American Psychiatric Association 1994)).  An IQ score of about 70 or below is classified as mental retardation.  Id.

representation of her abilities, and that she could score in the borderline range. (Tr. 163-64.)

Jaros's reading skills were not quite at the 4th grade level. For that reason, her daughter helped her complete some of the test questions. In a typical day, Jaros fed her two dogs, watched a little television, took naps, and went to bed at 10:30. Jaros said she could manage money, but could not stand on her feet for very long. Keough concluded that Jaros was "mildly to moderately limited by anxiety and learning disabilities." He also found she suffered from a moderate to marked level of impairment with respect to sustaining concentration, being persistent in tasks, and maintaining an adequate pace, such that would be necessary to work a 40-hour week. Keough believed Jaros would benefit significantly from mental health treatment. With treatment, he believed her impairments would be moderate only. He diagnosed Jaros with generalized anxiety disorder, learning disorders, mild cognitive deficits, borderline intellectual functioning, and personality disorder with no obvious symptoms. Keough found Jaros had a full scale IQ of 68, a verbal IQ of 71, and a performance IQ of 70. Test results indicated her intellectual functioning was extremely low. (Tr. 164-69.)

On November 18, 2006, psychologist Keough completed a medical source statement. He indicated Jaros's impairments affected her ability to understand, remember, and carry out instructions. Jaros had a slight restriction with respect to understanding, remembering, and carrying out short, simple instructions, but had a marked restriction on understanding, remembering, and carrying out detailed instructions. Keough also indicated Jaros's impairments affected her ability to respond appropriately to supervisors, co-workers, and work pressures within a work setting. She had a moderate restriction with respect to making judgments on simple work-related decisions. Keough believed she would have a moderate restriction with respect to interacting appropriately with the public and co-workers, and a marked restriction in her ability to respond appropriately to changes in routine. These conclusions were based on his diagnosis of generalized anxiety disorder, personality deficits with histrionic features, and learning

disabilities.  Finally, Keough did not believe Jaros would be able to manage benefits in her best interest.  (Tr. 170-72.)

On March 20, 2007, Jaros's attorney wrote to the ALJ to request a favorable decision or, in the alternative, a supplemental hearing.  John Keough had recently examined Jaros and found she had an IQ of 64, and read at the 4th Grade level, if not lower.  (Tr. 75.)

**Testimony at the Hearing**

On August 23, 2006, Jaros testified before the ALJ.  The ALJ noted that Jaros's claim had been denied for technical reasons, namely that she had failed to attend a consultative examination.  Jaros dropped out of school in 8th grade, though she was about 17 at the time, having been held back several times.  She did not ever receive a GED or education certificate.  She could read magazines and newspapers to some degree only.  Jaros had testified before an ALJ in 2005.  Since that hearing, Jaros had suffered a bone spur in her foot and carpal tunnel syndrome in her wrists.  She also suffered from depression, and spent a lot of time sitting at home and crying.  She had the crying spells for a couple of hours at a time, every two or three days.  (Tr. 273-78.)

Jaros's daughter brought her to the hearing because she did not drive much anymore.  Two or three times a week she did not even leave her room.  She would just stay inside and daydream.  She attempted to see a psychiatrist, but he had canceled his appointments.  Another psychiatrist only examined Jaros for a matter of minutes.  Jaros's general practitioner had recommended she see a psychiatrist because of her depression, and had decided not to prescribe any anti-depressants until that exam.  Jaros explained that she had left her consultative examination because she had been waiting all day for the exam, and there were still several people ahead of her.  (Tr. 278-81.)

If Jaros was not staying inside all day, she would wake up at 9:00, clean the house a little, and maybe walk around the yard.  She did not see any friends or participate in any activities.  Jaros's attorney indicated her physical impairments were not disabling, and asked the ALJ to request an IQ exam and a psychological evaluation.  The ALJ agreed to order these examinations, and also agreed to hold the record open for

thirty days for the submission of any new records relating to her wrist or foot.  (Tr. 281-85.)

**Testimony at Supplemental Hearing**

On May 30, 2007, Jaros testified at a supplemental hearing.  Jaros attended school until the 8th grade, and never received a GED of any kind.  While in school, she was in special education classes.  Yet, Jaros did not indicate that mental problems would keep her from working all jobs.  Jaros had trouble sleeping through the night, waking up periodically.  She suffered from crying spells a few times each day, for at least a couple of hours.  The crying spells were not triggered by anything in particular.  (Tr.  286-93.)

Jaros lived by herself, and mostly had bad days.  During bad days, she did not want to get out of bed.  Once or twice a week, she might spend the entire day in bed.  She did not get along well with other people, because she did not know how to interact with others.  She got nervous and really upset if she was around large groups of people.  Her daughter did the grocery shopping; Jaros just did not go into stores. Jaros was not currently seeing her psychologist.  Her trailer had suffered damage from an ice storm and a fire, and she had not had time to see her.  The psychologist would come to Jaros's trailer.  (Tr. 293-96.)

Jaros had physical problems as well.  Her right foot had a spur, and her left foot was beginning to develop a spur.  But because of her high blood pressure, the foot specialist said he could not operate on them.  As an alternative, Jaros took pain medication.  Jaros suffered from migraines once or twice a week, possibly from stress.  Her regular physician did not prescribe anything for the migraines, and she was not seeing a specialist.  As a result, Jaros just took Tylenol and her regular pain pills, and applied a cold towel to her head.  She did not take any kind of preventative medication.  Jaros had trouble hearing, but worried about having any sort of surgery done to correct the problem.  Her ears got infected frequently.  (Tr. 296-98, 301-02.)

She experienced pain every day, mostly in her feet.  She usually sat down and massaged her feet to relieve the pain and numbness.  She

did this every three or four hours.  She stated that she could not stand on her feet for very long.  Jaros suffered from tuberculosis, which caused frequent coughing and, when she walked, caused heavy breathing. She could walk about a mile before she needed to sit down and rest. Jaros was taking medication to control her high blood pressure, but she did not think it was working.  Her high blood pressure made her feel dizzy and faint.  She felt light-headed a few times each day, and needed to sit down when it happened.  (Tr. 296-302.)

Jaros did not watch much television.  She listened to the radio, but needed to do so at a high volume.  The ALJ had Jaros read from the record to gauge her reading ability.  Jaros stated that she could understand a little of what she had read.  Jaros had almost no ability to do simple math.  She told the ALJ she did not like talking to people, but did not mind simply being around them.  She did not have any close friends, and was not dating anyone.  She did not attend church, and had not looked for a job in the past year.  She thought she could possibly do a job that did not require standing.  The fast food jobs she had held required her to work too quickly.  Jaros had been living off of food stamps, Medicaid, and support from her daughter.  (Tr. 302-09.)

Jaros had rescheduled one of her consultative appointments and drove 185 miles to the next appointment, only to learn it had been canceled when she got there.  The third time, the doctor came to her house for the evaluation.  During that six-hour evaluation, Jaros tried her best on the tests, and completed them herself.  (Tr. 309-11.)

Jaros had never been seen inpatient for depression or anxiety.  She never had prolonged treatment with a psychiatrist or psychologist for depression or mental problems.  She had been seeing a mental health professional at Pathway for a period of about two months, but had not seen her since January.  Jaros took a pill for two or three months for her tuberculosis, and her doctors told her she was in remission. Doctors x-rayed her chest every six-weeks.  (Tr. 311-13.)

Jaros had a license, but did not drive, though she could drive if there was an emergency.  She kept her home clean, dusting and washing dishes, but her grandson vacuumed and her daughter did the laundry at her home.  However, if Jaros had her own washer and dryer, she would be

able to do her own laundry.  Growing up, Jaros was a normal child, walking, talking, and starting school at the normal ages.  She was a healthy child, who was able to stay out of trouble.  (Tr. 313-21.)

During the supplemental hearing, Dr. James Reed testified as a medical expert and asked Jaros certain questions.  Dr. Reed had reviewed the medical record, but had never treated Jaros.  Jaros had been taking psychiatric medication, specifically anti-depressants, but the medication made her sick and the nurse told her not to take them anymore, so she stopped.  At the time of the hearing, Jaros was not taking any psychiatric medication.  She was, however, still taking Captopril for high blood pressure, Metformin, Potassium, Hydrocodone for foot pain, Tannate for a head cold, and Clarithromycin for a bacterial infection.[15]  She had been taking Hydrocodone for the past two or three months.  (Tr. 321-25.)

Dr. Reed evaluated Jaros under 12.06, the listing for anxiety disorders.  Dr. Reed noted that the Pathway diagnosis found Jaros suffered from anxiety and post-traumatic stress disorder, but it was unclear where the PTSD diagnosis came from.  Dr. Reed found Jaros did not meet the criteria for any of the anxiety disorders.  Dr. Reed also evaluated Jaros under 12.04, the listing for affective disorders, and found Jaros met the A criteria, but not the B criteria.  Dr. Reed took issue with the report and conclusion from psychologist Keough for several reasons.  First, the psychologist allowed Jaros to take the test with the assistance of her daughter, which was improper.  Second, the psychologist allowed Jaros to keep the book and mail the test back to him, which was a violation of test security and of the standards and practices of psychologists.  Third, the psychologist himself noted that Jaros had not put forth her best effort.  (Tr. 325-27.)

Dr. Reed disagreed with the medical source statement attached to the Keough report, as based on improperly acquired and administered tests, and an improper interpretation of those tests.  The reports from

---

[15]Tannate is used to temporarily treat runny nose and other symptoms caused by allergies, hay fever, the common cold, or other breathing illnesses.  Clarithromycin is used to treat a wide variety of bacterial infections.  WebMD, http://www.webmd.com/drugs (last visited July 22, 2009).

Pathway only documented situational complaints. One of the reports assigned Jaros a GAF score of 40, but it was not signed by a psychiatrist. According to Dr. Reed, a licensed professional counselor was not qualified to make that diagnosis. In his opinion, Jaros's testimony was not completely credible. He noted she was exhibiting "an exaggeration of symptoms that are not consistent with any objective medical records." (Tr. 327-28, 336.)

Dr. Reed did not disagree with the Pathway report of December 21, 2005, from Dr. Karen MacDonald that assigned Jaros a GAF score of 50, but noted that it was based on a one-time assessment. Dr. Reed also noted that there was no formal assessment of Jaros's memory to support the memory findings in the report, and the conclusions about impaired social skills, an impulse control disorder, and aggressive impulses were not borne out by Jaros's testimony. Dr. Reed also noted that the GAF restriction did not address restrictions of daily activities. (Tr. 328-34.) Jaros noted she had been angry when she was talking to Dr. MacDonald, and that she had never hurt anyone or got into a fight with anyone. (Tr. 334-35.)

During the supplemental hearing, Jeffrey McGrowsky, Ph.D., testified as a vocational expert (VE). Jaros worked the longest doing factory jobs, which she found through a placement service. If the VE accepted Jaros's testimony as completely credible, he testified that Jaros would not be able to work any regular jobs. He based this conclusion on her crying spells, hearing problems, headaches, limited education, and her inability to stand because of her feet. If the VE assumed that Jaros had no significant physical limitations, but had a depression that made complex or detailed work impossible, an inability to master and apply detailed instructions, an inability to interrelate with the public because of irritability, and could only tolerate incidental contact with co-workers, the VE testified that Jaros could perform work as a general laborer. More precisely, the VE testified that Jaros could perform her past factory work. The VE classified this work as simple, unskilled work. A hearing impairment would not prevent Jaros from working these jobs. But if Jaros had a GAF score of 50, the VE did not think Jaros would be able to keep a job. (Tr. 336-42.)

### III.  DECISION OF THE ALJ

The ALJ found Jaros suffered from depression and hypertension, but that she did not have a severe impairment or combination of impairments. In reaching this conclusion, the ALJ considered the claimant's symptoms and the opinion evidence.  In particular, the ALJ found that Jaros's impairments could be expected to produce the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  (Tr. 10-14.)

The ALJ found no objective medical evidence to support Jaros's allegations of significant hypertension, tuberculosis, or foot problems. The evidence showed that Jaros did not seek regular care for her blood pressure, did not take her medication, and that her blood pressure was usually within a normal range.  Chest x-rays for Jaros were negative, and Jaros herself reported her tuberculosis was inactive.  There was no evidence of any treatment for foot problems or headaches, and Jaros denied any musculoskeletal or arthritic problems in September 2006. (Tr. 14-15.)

The ALJ noted Jaros only began complaining of depression during her first visit to Dr. Schuetz, despite alleging an onset date of January 2000.  Jaros denied suffering from emotional or mental problems to the triage nurse, and told Pathway evaluators she was there only because her attorney had told her to go.  She denied being violent or having any violent urges during the hearing.  The ALJ noted that the records from Pathway were not signed by a medically acceptable source.  Based on Dr. Reed's testimony during the hearing, the ALJ considered the results of the tests administered by John Keough to be invalid.  The ALJ also noted that Keough did not believe Jaros had given her best effort, further discrediting the results of the test.  (Tr. 15-16.)

The evidence indicated Jaros engaged in normal daily activities. She cared for a boarder, believed to have Alzheimer's.  She cleaned her home and could do her laundry if she wanted.  She occasionally left her trailer to see her psychiatrist.  Dr. Reed found no clinical evidence of an anxiety problem or a severe impairment.  The ALJ discounted the report of Dr. MacDonald as based entirely on Jaros's own reports to the doctor.  (Tr. 16-17.)

The ALJ found Jaros not entirely credible. She did not see a psychiatrist until directed to do so by her attorney. She claimed to avoid people and confrontation, but reported going to the drugstore to test her blood pressure three times a day. During the hearing, she said she was not anxious or apprehensive. Finally, the ALJ noted that Jaros had earned significant wages for only one year, and had any type of earnings for a total of only six years. (Tr. 17.)

The ALJ gave great weight to the testimony of Dr. Reed. Dr. Reed asked Jaros questions during the hearing. Dr. Reed also noted significant shortcomings with the assessments by Dr. MacDonald and Mr. Keough. The ALJ found Dr. Reed supported his assessment with appropriate conduct, methods, and explanations. In turn, the ALJ gave little weight to the opinions of Dr. MacDonald, Mr. Keough, and the state agency psychologist, finding their respective assessments were not supported by objective evidence, relied on improper testing methods, and were based on an incomplete record. The ALJ gave some credit to the observations of the Pathway workers. (Tr. 17-18.)

Taken as a whole, the ALJ concluded there was no medically acceptable evidence that Jaros's impairments were disabling. Jaros rarely went to the doctor for medical care, frequently denied or downplayed her tuberculosis and depression, and did not always follow her medication regimen. Jaros was unable to add during the hearing, but she was able to multiply. The ALJ found this behavior detracted from Jaros's credibility. (Tr. 18-19.)

The ALJ considered the four functional areas for evaluating mental disorders. First, the ALJ found Jaros had no limitation in daily living activities. She cleaned her home, cared for a boarder, and could wash her own clothes if she wanted to. Second, the ALJ found Jaros had a mild limitation in social functioning. She had difficulty getting along with her neighbors, but denied any intention of harming them. She was also able to go to the pharmacy to test her blood pressure. Third, the ALJ found Jaros had at worst a mild limitation in concentration. She was able to clean her home and care for a boarder, and had worked in a factory. She complained of crying spells, but failed to seek psychiatric treatment. She also failed to give a complete effort on her

tests.  The VE testified that she could perform her past work without having to maintain significant interactions with co-workers.  Fourth, the ALJ found no evidence Jaros had experienced any episodes of decompensation.  There was no evidence of any hospitalizations for mental treatment, and Jaros never received inpatient or outpatient treatment for depression before going to Pathways.  In sum, Jaros had no more than a mild limitation in one of the first three functional areas, and no limitation in the fourth area.  Her mental impairments were therefore non-severe, and the ALJ found Jaros was not disabled within the meaning of the Social Security Act.  (Tr. 19-20.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's final decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id. If the claimant fails to meet the criteria at any step of the evaluation, the process ends and the claimant is determined to be not disabled.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

In this case, the Commissioner determined that Jaros did not suffer from any severe impairments, and ended the analysis at Step Two.

## V.  DISCUSSION

Jaros argues generally the ALJ's decision is not supported by substantial evidence.  More specifically, she argues, first, that the ALJ failed to give adequate weight to the opinion of her treating physician.  In particular, she argues the ALJ failed to consider the various factors, set out in 20 C.F.R. § 404.1527(d), for evaluating an opinion by a treating physician.  Second, she argues the ALJ erred by failing to recontact her treating medical provider.  (Doc. 12.)

**Judging Mental Impairments**

Evaluating mental impairments is often more complicated than evaluating physical impairments.  Obermeier v. Astrue, Civil No. 07-3057, 2008 WL 4831712, at *3 (W.D. Ark. Nov. 3, 2008).  With physical impairments, evidence of symptom-free periods offers strong evidence against a physical disability.  Id.  The same is not true for mental

- 18 -

impairments.  Id.  With mental impairments, evidence of symptom-free periods does not mean a mental disorder has ceased.  Id.  Mental illness can be extremely difficult to predict, and periods of remission are usually of an uncertain duration, marked with the ever-pending threat of relapse.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

Adding to these difficulties, individuals with chronic psychotic disorders often structure their lives in a way to minimize stress and reduce their signs and symptoms.  Id.  Given the sometimes competitive and stressful conditions in which people work, individuals with mental impairments "may be much more impaired for work than their signs and symptoms would indicate,"  Id.; Obermeier, 2008 WL 4831712, at *3. Worse yet, efforts to combat mental illness present their own unique difficulties.  See Pate-Fires, 564 F.3d at 945.  Individuals with mental illness often refuse to take their psychiatric medication – a symptom of the illness itself, rather than an example of willful noncompliance. Id.

**Step Two of the Evaluation Process**

The ALJ determined that Jaros did not suffer from any severe impairments or severe combination of impairments, and ended the inquiry at Step Two of the five-step evaluation process.  This was error.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).  The claimant bears the burden of proving her impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant.  Id.; Dewald v. Astrue, 590 F. Supp. 2d 1184, 1200 (D.S.D. 2008).  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ."  Kirby, 500 F.3d at 707; see also Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 774 (6th Cir. 2008) (per curiam) ("[S]tep-two severity review is used primarily to screen out totally groundless claims.").

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or

mental ability to do basic work activities.  <u>Kirby</u>, 500 F.3d at 707; 20 C.F.R. § 404.1521(a).  Under the regulations, the ALJ evaluates the severity of mental impairments by gauging their impact on four functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  <u>Cuthbert v. Astrue</u>, 303 F. App'x 697, 699 (11th Cir. 2008) (per curiam); 20 C.F.R. § 404.1520a(c)(3).  If the ALJ rates the claimant's limitations as "none" or "mild" in the first three areas, and "none" in the fourth area, the ALJ will generally conclude that the claimant's mental impairments are not severe – <u>unless</u> the evidence indicates that there is more than a <u>minimal limitation</u> in the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520a(d)(1).

Basic work activities concern the abilities and aptitudes necessary to perform most jobs.  20 C.F.R. § 404.1521(b).  Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  <u>Id.</u> The sequential evaluation process terminates at Step Two if the impairment has no more than a <u>minimal</u> effect on the claimant's ability to work.  <u>Kirby</u>, 500 F.3d at 707; <u>Hudson v. Bowen</u>, 870 F.2d 1392, 1396 (8th Cir. 1989).

In this case, the evidence in the record very strongly indicates Jaros's mental impairments amount to more than a minimal limitation on her ability to perform basic work activities.  In December 2005, Jaros told Karen MacDonald she did not like to be around other people and wanted to kill her neighbors.  MacDonald found Jaros could not count by 3s and her social judgment skills were "massively impaired." (Tr. 161.) According to the regulations, use of judgment is one of the basic work activities.  20 C.F.R. § 404.1521(b)(4).  MacDonald also found that Jaros functioned in the mildly retarded range.  <u>See</u> <u>Buckner v. Apfel</u>, 213 F.3d 1006, 1009 (8th Cir. 2000) (noting that the ALJ found claimant's mild mental retardation to be a severe impairment); <u>Anderson</u>

v. Apfel, 996 F. Supp. 869, 871 (E.D. Ark. 1998) (same).  Finally, Dr. MacDonald assigned Jaros a GAF score of 50 - indicating the presence of serious symptoms or a serious impairment in social, occupational, or school functioning (such as the inability to keep a job).  See Pate-Fires, 564 F.3d at 944 (noting the seriousness of a GAF score of 50 or below).

In September 2006, Connie Collins, a licensed professional counselor, spoke with Jaros.  Collins rated Jaros's depression, anger, and isolation as severe and chronic.  She found Jaros had a dysphoric mood and cried throughout the interview.  Jaros indicated she had no desire to do anything or go anywhere.  While these observations do not hold the sway of a medical opinion, they merit some consideration. Norris v. Astrue, No. 4:08 CV 352-BD, 2009 WL 1505321, at *4 (E.D. Ark. May 28, 2009) ("The ALJ may consider 'other sources' such as therapists and social welfare agency personnel to show the severity of an impairment and how it affects the claimant's ability to work, but not to establish the impairment."); 20 C.F.R. § 404.1513(d).

In October 2006, an unknown physician completed a diagnostic evaluation.  Like Dr. MacDonald, this physician found Jaros exhibited poor judgment, and assigned her a GAF score indicating very serious symptoms.  The physician also noted Jaros had poor insight, depression, and auditory hallucinations.  This physician prescribed Jaros a trial of two different medications for depression.

In November 2006, John Keough found Jaros had anger management issues and her memory was poor.  On an IQ test, Jaros tested in the mentally retarded range.  Keough believed this score was artificially low, but that a more accurate score would still reflect borderline intellectual functioning.  See Nicola v. Astrue, 480 F.3d 885, 887 (8th Cir. 2007) ("A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence.").  He also found she had at least a moderate impairment with respect to maintaining concentration or pace - another indication her mental impairments were severe.  See 20 C.F.R. § 404.1520a(d)(1).  In a medical source statement, Keough found Jaros had  more than moderate restrictions in her use of judgment, moderate

restrictions in interacting with the public and co-workers, and marked restrictions in her ability to deal with changes in a work routine. In other words, Keough believed Jaros had moderate to marked restrictions in three of the six basic work activities. See 20 C.F.R. § 404.1521(b)(4)-(6).

Taken as a whole, the medical record reveals that Jaros had borderline intellectual functioning, serious or very serious symptoms (as indicated by GAF scores of 50 and 40), crying spells, anger management issues, difficulty concentrating, poor judgment, trouble getting along with others, and difficulty adapting to changes in routines. Even if partially discounted, this evidence indicates Jaros's mental impairments would have more than a minimal effect on her ability to work, and that her mental impairments were severe. See Kirby, 500 F.3d at 707. The ALJ erred by finding Jaros's impairments were not severe at Step Two.

**Weighing Medical Testimony**

The ALJ determined Jaros's impairments were non-severe by discounting the findings of Dr. MacDonald and Mr. Keough, and favoring the findings of Dr. Reed. This was error.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Still, the opinion of the treating physician is not conclusive in determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The

ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

Dr. Reed never treated Jaros; he simply asked her questions and reviewed her medical records during a supplemental hearing. Unlike Dr. MacDonald and Mr. Keough, Dr. Reed never conducted any tests of Jaros. Between the three of the them, Dr. Reed spent the least amount of time with Jaros, and did so in a non-clinical setting. Under Singh, the opinion of a non-examining physician "does not generally constitute substantial evidence." Singh, 222 F.3d at 452; see also Hall v. Astrue, No. 3:07-cv-1053-J-JRK, 2009 WL 890389, at *10 (M.D. Fla. Mar. 31, 2009) ("[A] non-examining consultative physician's opinion is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision.").

The ALJ rejected the reports from Dr. MacDonald and Mr. Keough on the basis of Dr. Reed's testimony. Yet, Dr. Reed did not disagree with Dr. MacDonald's report, in which she assigned Jaros a GAF score of 50. In addition, Keough himself stated that he believed Jaros's test scores were not completely accurate, and that she had not put her best efforts. But even after accounting for Jaros's lack of motivation and effort, Keough still believed she would score in the borderline functioning range. Under the circumstances, the ALJ gave too much weight to the testimony of the non-examining psychologist, and too little weight to the testimony of the two examining psychologists. This was error under the regulations. See Dewald, 590 F. Supp. 2d at 1201 (citing 20 C.F.R. § 404.1527(d)(1)).

## VI.  RECOMMENDATION

The evidence in this case indicates that Jaros's mental impairments amounted to more than a slight abnormality. The case should therefore

be remanded to require the ALJ to reconsider the severity of plaintiff's mental impairments. See Obermeier, 2008 WL 4831712, at *4. Since her mental impairments are at least severe, the ALJ must determine whether her mental impairments satisfy any of the listing requirements at Step Three. The ALJ must also consider the effect of Jaros's non-severe physical impairments in calculating her RFC.[16] See 20 C.F.R. § 404.1545(a)(2); see also Hall, 2009 WL 890389 ("[I]n assessing a claimant's RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). Finally, the ALJ should be required to revisit the medical testimony, giving more weight to the opinions of the examining psychologists, and less weight to the opinion of the non-examining psychologist. 20 C.F.R. § 404.1527(d)(1). If necessary, the ALJ should consider re-contacting the medical sources. 20 C.F.R. § 404.1512(e).

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


                                       /S/   David D. Noce
                                     **UNITED STATES MAGISTRATE JUDGE**


Signed on August 13, 2009.

---

[16]Jaros's attorney has conceded that her physical impairments "don't rise to a level of being disabling." (Tr. 282.) The undersigned agrees with this assessment.